## AFFIDAVIT IN SUPPORT OF

## AN APPLICATION FOR A SEARCH WARRANT

I, Colin M. Simons, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of finding probable cause to search a black iPhone (hereinafter, the "SUBJECT DEVICE"), currently in the custody of the Brattleboro, Vermont Police Department (BPD), which was seized on October 28, 2025. The SUBJECT DEVICE is more fully described in Attachment A. The SUBJECT DEVICE was seized by law enforcement during the arrest of SCOTT KIELBASA following the execution of a search warrant authorized by the State of Vermont on October 28, 2025, at 54 Harris Place, Apartment 301, Brattleboro, Vermont. The address is the residence for SCOTT KIELBASA and ELLA THORNE-THOMSEN. Both KIELBASA and THORNE-THOMSEN were charged by the State of Vermont based on the apartment search in Windham County Superior Court with cruelty to a child, fentanyl trafficking, possession of cocaine, and possession of a firearm while committing a felony.

2. I am a Special Agent with the FBI currently assigned to the Burlington, Vermont, office, which is part of the Albany, New York Division. I have been a Special Agent with the FBI for over 20 years. I am responsible for working cases involving a variety of criminal conduct, including drug investigations, violent crimes, and gangs/drug trafficking organizations. I have been the affiant for numerous federal complaints and search warrants pertaining to violent crimes and drugs. As a Special Agent, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States.

3. The facts set forth in this affidavit are based on my training and experience, business records, reports from other law enforcement agencies, other information obtained from other law

enforcement officers. Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included in this affidavit every detail of the investigation. Rather, I have set forth facts that I believe are sufficient to establish probable cause for the issuance of the requested search warrant. Unless specifically indicated otherwise, any conversations and statements described in this affidavit are related in substance and in part only.

4.     Based on the facts set forth in this affidavit, there is probable cause to believe that the SUBJECT DEVICE, as described in Attachment A, contains evidence of KIELBASA and THORNE-THOMSEN being unlawful users of a controlled substance and in possession of firearms in violation of 18 U.S.C. § 922(g)(3), as well as maintaining drug-involved premises in violation of 21 U.S.C. § 856, and possessing with intent to distribute and distributing controlled substances in violation of 21 U.S.C. § 841(a).

## PROBABLE CAUSE

*Recovery of unattended bag*

5.     On September 16, 2025, BPD received a call from an individual advising they found a handbag full of drug paraphernalia near the playground of the Centre Congregational Church. BPD officers Stevens and Turner responded to the church, which is located at 193 Main Street, Brattleboro, Vermont.

6.     The caller, who was identified at the scene, advised BPD that they spotted the unattended bag and performed a cursory search of the bag but stopped as soon as they saw what looked like drugs. Turner and Stevens emptied the bag, one item at a time. Within the bag, they discovered several items to include approximately $516 in U.S. Currency, two .22 caliber firearms (both loaded), a pill bottle with no prescription with eleven different types of pills including suspected Buprenorphine, Adderall, Klonopin, Clonazepam, one unidentified pill, and a small amount of

what Turner suspected to be cocaine base[1]. Among the items in the bag was a ripped shipping label with "Ella 43 Harris PL Apt 301" on it. A review of a police database by Turner showed THORNE-THOMSEN as residing at 54 Harris Place, Apt. 301.[2]

7. On October 4, 2025, BPD officers Marchand and Turner responded to 54 Harris Place, Apartment 301, Brattleboro, Vermont for an unrelated issue. Turner attempted to talk to THORNE-THOMSEN about the unattended bag and she advised she did not wish to speak to BPD any further.

*Vehicle stop*

8. On October 5, 2025, at approximately 7:52 AM, BPD officers Evans, Gouger, and Sergeant Hamilton responded to a report of a female reportedly sleeping behind the wheel of a 2017 Chevrolet Silverado, bearing Vermont temporary registration 527A650, in a pull-off on Maple Street in Brattleboro, Vermont. Upon Evans' arrival, he located the vehicle and believed the vehicle was running as the headlights and taillights were on. According to his report, Evans believed the operator of the vehicle, THORNE-THOMSEN, turned off the vehicle when she saw him.

9. Gouger and Evans spoke with THORNE-THOMSEN who stated she was ok to drive and had not taken any substances. She stated she had driven there so she could take a nap in her truck because her house was dirty. She further advised she was going to go for a hike.

10. While speaking with THORNE-THOMSEN, Evans located a hypodermic needle on the ground in front of the vehicle. Based on his prior professional training and experience Evans knew

---

[1] The substance field-tested positive for cocaine and Turner identified it as cocaine base through his training and experience.
[2] According to Turner's report, 54 Harris Place is approximately 450 feet from where the bag was located.

hypodermic needles to be commonly used to inject heroin/fentanyl. The needle also appeared to Evans to have fresh blood inside of it. When asked about the needle, THORNE-THOMSEN stated that it was not hers.

11. Hamilton and Evans told her that they wanted to conduct field sobriety tests to prove that she was able to drive. THORNE-THOMSEN then tried walking away. They advised her that she was detained and could not leave. THORNE-THOMSEN then asked several times if she was free to leave and Evans told her she was not free to leave. Hamilton asked her what the unidentified pills were inside of her vehicle. THORNE-THOMSEN then began to run away across the street. Hamilton told her that she was under arrest. Evans grabbed onto her bag and pulled on it causing her to fall. Hamilton, Gouger and Evans needed to use force to control THORNE-THOMSEN multiple times as she kept trying to leave.

12. While searching her incident to arrest Hamilton and Evans located choreboy in her pocket. From prior professional training and experience Evans knew choreboy to be commonly used as a filter to smoke crack cocaine. THORNE-THOMSEN was then placed into a BPD cruiser and transported to the Brattleboro Police Department.

13. Evans looked through the window of THORNE-THOMSEN's vehicle and he could see a long skinny piece of metal near the center console, a small tied off piece of plastic that was ripped open on the driver's side floor and two small white rocks on the driver's seat that appeared to be consistent with cocaine. Based on his prior professional training and experience, he knew a long skinny piece of metal to be commonly used to clear out a crack pipe. He also knew small tied-off pieces of plastic to be commonly used to store crack cocaine.

14.     When back at BPD, Drug Recognition Expert Morris arrived and performed tests with THORNE-THOMSEN. Morris stated that based on his observations he believed she was impaired from a central nervous system stimulant.

15.     Evans completed the DUI blood packet for THORNE-THOMSEN for which she consented to give a sample of her blood. Evans transported her to the Brattleboro Memorial Hospital where staff attempted to collect the blood sample; however, after many attempts they were unable to draw blood from her. THORNE-THOMSEN was then provided with a citation and released.

16.     On October 27, 2025, BPD executed a state search warrant for THORNE-THOMSEN's vehicle. BPD located substances that field tested positive for fentanyl and cocaine. Officers identified the suspected cocaine as cocaine base based on its appearance and their training and experience. In total, approximately 0.31 grams of suspected cocaine base and approximately 4.35 grams of fentanyl in a plastic bag plus four wax paper folds commonly referred to as tickets containing smaller amounts of fentanyl were recovered during the search.

*Voicemail from THORNE-THOMSEN*

17.     On October 16, 2025, THORNE-THOMSEN left a voicemail for Evans describing the conversation she had had with Marchand and Turner (on October 5, 2025) and stated that her truck had been broken into the previous evening (October 4, 2025) claiming the bag could have been stolen.

*Seach of 54 Harris Place, Apartment 301*

18.   On October 28, 2025, BPD officers Cooke, Gouger and Evans went to 54 Harris Place, Apartment 301, Brattleboro, Vermont to arrest THORNE-THOMSEN based on the evidence seized during the search of her vehicle. KIELBASA met them at the door and advised that he lived at the address with THORNE-THOMSEN and that he recently asked her to move out. A subsequent search of Valcour showed that both KIELBASA and THORNE-THOMSEN were listed as residing in the apartment. KIELBASA stated that THORNE-THOMSEN was in the residence and allowed the officers to enter.

19.   Evans took THORNE-THOMSEN into custody. While speaking to her, Evans observed a handgun that was on a shelf in her apartment. Based on the fact that BPD located a felony amount of narcotics inside her vehicle, Evans believed he had probable cause to seize the firearm he could see in plain view. KIELBASA stated that he had several firearms inside the apartment. KIELBASA and THORNE-THOMSEN gave consent to BPD to search the apartment for firearms.

20.   Upon searching for firearms, BPD located three handguns in the living room, one AR-15 in the living room, one flare and one shotgun in the living room, one .22 caliber rifle in the kitchen and several rounds of loose ammunition on the floor of the living room.

21.   Multiple loose rounds were located near the television in the living room. A BPD officer opened a small black plastic container that could fit several rounds in it. Upon opening it, she located a purple powdery substance that appeared to be consistent with fentanyl in a small tied off plastic bag.

22.   Another BPD officer located a plastic bag that was tied off on the television stand that contained a white powdery substance that appeared to be consistent to cocaine base. The officer also located a yellow plate behind the television that had a rolled-up dollar bill on it with an

unknown white powdery substance that appeared to be consistent with cocaine. Based on prior professional training and experience Evans knew people commonly use rolled up currency to snort cocaine.

23. Evans asked THORNE-THOMSEN and KIELBASA for consent to search the apartment for narcotics, but KIELBASA denied consent. The suspected drugs that were located were not seized. Everyone was removed from the apartment and the apartment was seized for the process of applying for a search warrant.

24. Evans searched THORNE-THOMSEN incident to arrest and located a large white rock that appeared to be consisted with cocaine base. Evans later field tested the suspected cocaine base and it tested positive for cocaine. The rock weighed approximately 2.14 grams.

25. After KIELBASA's arrest, a BPD officer confiscated the cell phone described in attachment B from KIELBASA.

26. On October 28, 2025, a state search warrant was obtained for 54 Harris Place, Apartment 301, Brattleboro, Vermont. In summary, law enforcement located the following during its search:

    a. Approximately $2,190 in U.S. currency;

    b. Approximately 32 grams of substances that field tested positive for cocaine base (found in several locations around the apartment including the living room, living room closet, and kitchen);

    c. Approximately 8 grams of suspected fentanyl that tested positive for fentanyl[3]; and

---

[3] A few of the containers were not tested due to the way they were packaged and for safety concerns.

    d. Approximately 16[4] firearms (including handguns, rifles and AR-15 style weapons). Of those firearms, two were reported as stolen in NCIC, a Walther semi-automatic pistol and a Ruger Carbine .22LR.

27. Drugs were located throughout the apartment during the search, including on the TV stand in the living room, in the living room closet, on a desk and in a cabinet in the kitchen, and in a metal basket and dresser in the first bedroom. Many of these drugs were in plain view, including a debit card with a white powdery substance on the coffee table in the living room and a crack pipe with a white powdery substance stuck to it on the TV stand in the living room,

28. Based on my training and experience, the quantities of narcotics recovered are consistent with the distribution of cocaine base and fentanyl.

*Search of Basement Room*

29. On November 3, 2025, BPD officers spoke with Robert Lyons, the manager of the apartment building at 54 Harris Place, Brattleboro, Vermont. Lyons stated that in addition to Apartment 301, KIELBASA and THORNE-THOMSEN had a small storage room in the basement of the building. BPD checked the basement and located the room. Outside the room, BPD officers located a photograph of THORNE-THOMSEN and a debit card that read "Scott Kielbasa" on it. Looking through a small opening in the door, officers observed a tote bag that said "Ella" and a work bench with several hypodermic needles on it.

30. On November 3, 2025, BPD obtained a state search warrant for the basement room. BPD executed that warrant on November 4, 2025. In summary, officers located the following in the basement room:

    a. a total of .95 grams of a substance that tested positive for cocaine;

---

[4] One of the weapons is a flare gun.

b. a total of 2.73 grams of substances that tested positive for fentanyl and one fentanyl patch;

c. 3.08 grams of substances that tested positive for methamphetamine;

d. a mortar and pestle, two scales, and a small strainer, all with residue that tested positive for cocaine;

e. a vial of ambisol, acetone, and two boxes of baking soda;

f. a pill press and tacklebox with multiple pills and loose white powder,

g. ammunition for a Remington 16-gauge shotgun, a magazine for a Sig Sauer .45, and an assortment of other ammunition on the workbench;

h. an EBT card with the name "Thomsen-Thorne" with white powder on it that tested positive for cocaine;

i. other substances that were not tested for narcotics due to the way that they were packaged and safety concerns.

*My training and experience*

31. Based on my training and experience, I know that distributors of controlled substances frequently retain contact information about, historical messages with, and other data regarding their sources and customers of controlled substances in their cell phones. Evidence of controlled substance transactions on cell phones often includes logs of calls, text messages (both within the phone's text messaging application and third-party applications such as WhatsApp and Facebook Messenger), contact lists, photos, and notes in various applications. The phone data frequently establishes details of specific drug transactions, such as the date, time, quantity, cost, and means of payment, including payments through cell phone applications such CashApp, Venmo, or

cryptocurrency transactions. Communications stored or logged on the phones may also contain evidence of alleged debts owed to the sources of controlled substances.

32. In my training and experience, drug distributors also frequently photograph and send images of their products to users as a means of advertisement. Drug distributors also frequently photograph and send images of the proceeds from drug sales. Such images may appear in messages between the distributor and users in various applications and may be stored on the device.

33. Distributors of controlled substances often carry firearms to protect both their drug supply as well as any profits they may obtain from their distribution activities. I am aware of investigations (related to the distribution of controlled substances) in which evidence of unlawful purchases and possession of firearms have been found in the data stored in cellular telephones, including photos stored in the cellular telephone memory - some of which have depicted firearms or individuals possessing firearms - text messages or calls to arrange the purchase of a firearm, or contact with a seller of a firearm through an online advertisement. Often, the same cellular telephones contain evidence related to the distribution of controlled substances, including photographs of controlled substances and bulk United States currency.

34. In my training and experience, drug distributors frequently use their cell phones to navigate, including to and from distribution locations and/or source cities, using global positioning system (GPS) access. Most current smart phones have a mapping application that provides location information and directions for navigation and/or additional navigation applications via download. Users frequently take screenshots of a map application to show others where they are or where to meet and send those images via a messaging application; alternatively, some mapping applications allow the user to send location data directly through a

"pin drop." Evidence of drug and firearm storage or distribution and sale locations therefore may be found in a phone's mapping applications, image database, and messaging applications.

35. In my training and experience, drug users frequently use cell phones to contact distributors, arrange locations and times for the purchase of drugs, and use payment applications to compensate distributors for drugs. Drug users may use cell phones to discuss the trade of firearms for drugs with distributors. The cell phones of drug users often contain the contact information of distributors and may convey information regarding locations used for distribution. Drug users may have photographs or videos of drugs, firearms, or of persons involved in distribution in their phones.

36. Finally, based on my training and experience, I also know that cell phones like the SUBJECT DEVICE maintain call records, text messages, application data, and other information that can be searched for evidence of a crime, as described above.

## CONCLUSION

37. Based on the foregoing, I submit there is probable cause to search the SUBJECT DEVICE, specifically described in Attachment A, for the evidence delineated in Attachment B. Because this warrant seeks only permission to a examine cell phone already in law enforcement's possession, I submit that there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

Dated at Burlington, in the District of Vermont, this 14th day of November, 2025.

Colin M. Simons, Special Agent

Federal Bureau of Investigation

Submitted and sworn to before me on November __14__, 2025.

*Kevin J. Doyle*

Honorable Kevin J. Doyle

United States Magistrate Judge